Rex Lamont Butler
745 W. 4th Avenue, Suite 300
Anchorage, AK 99501
Tel: (907)272-1497
Email: rexbutlercalendar@gmail.com
**Attorney for Plaintiffs**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA AT ANCHORAGE**

| | |
|---|---|
| THE ESTATE OF BISHAR ALI HASSAN, | ) |
| | ) |
| AHMED HASSAN AND BILAY ADEN IDIRIS, | ) |
|                       PLAINTIFFS, | ) |
|      Vs. | ) |
| | ) |
| MUNICIPALITY AND CITY OF ANCHORAGE, | ) |
| | ) |
| MATTHEW HALL, NATHAN LEWIS, BRETT | ) |
| | ) |
| EGGIMAN, AND DOES 1-20, INCLUSIVE, | ) |
|                     DEFENDANTS. | )   **3:21-cv-00076-SLG** |
| _____ | ) |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT AND, PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT PURSUANT TO 13 CFR § 134.212(a)(3)

Plaintiffs **incorporate by reference** filing at docket 37.

## THE REQUIREMENTS FOR SUMMARY JUDGMENT ARE NOT MET

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of

1

a genuine issue of material fact.  Celotex, 477 U.S. at 323. All justifiable inferences must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant. Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 888 (1990);  Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995).

Here, there are material issues of fact in dispute: (**1**) **Officer Hall credibility**. A few days after the shooting, Officer Hall told detectives that "most of the time how those turn out, we go, we contact suspect, detain him, secure the gun, uh, and we investigate what possible crime we have. Which is how I felt this call was-was going to go. We were gonna go up, we were gonna talk to the guy, we were gonna detain him, we were gonna secure the weapon, um and then we were gonna start talking to witnesses and possible victims of whatever crime might be…"[*Plaintiffs' exhibit # 1 Officer Hall's interview with detective pages 1&2*]. After talking to whomever and having had time to think and reflect on it, Officer Hall, while being deposed, testified that he stopped Bishar Hassan because "he had violated the law" [*Plaintiffs' exhibit #2, plaintiffs' deposition of Officer Hall page 33*]. A jury must decide if Officer Hall stopped Bishar Hassan based on how the police act "most of the time" or based on his testimony 2 years after the fact -that "he had violated the law". (**2**) **Whether Officer**

**Hall used excessive force** by continuing to shoot Bishar Hassan after the gun had fallen out of his hand. Officer Hall told detectives "I saw the reaction uh, from him, uh and, I -I mean, just with my aiming and where the rounds were going, **I knew I was getting hits on him**, Uh, as I was getting hits, he kinda curls over, uh, and starts falling to the ground." [*Plaintiffs' exhibit #3 Officer Hall's 1ˢᵗ interview with detectives, at page 6*]. (**3**) **Whether the defendants received the necessary and proper training** on how to respond and react to a call of someone with a gun. Defendants have not produced evidence establishing defendants received such training and during deposition, defendants could not articulate what training if any they received. (**4**) **Whether the policy relied on by the defendants' force expert** is the policy that was in place at the time of the incident at issue because the policy discovered to plaintiffs seems not have some of the language cited by the defendants' expert. [*Plaintiffs' exhibits #4-defendants' force expert report and #5 and email communication regarding the policy*]. (**5**) **Whether Ahmed Hassan was illegally seized, falsely arrested, and illegally detained for hours**. Defendants argue that he was not under arrest. However, Ahmed Hassan's testimony was that he went with the police because a police officer told him that he was required to by law. [*Plaintiffs' exhibit # 6 defendants' deposition of Ahmed Hassan at page 50*]. (**6**) **Whether the Officer acted reasonably**. "Without assistance by experts, the average layperson is qualified to determine how a reasonable person would act. U.S. v. Hanna, 293 F.3d

1080, 1086 (9th Cir. 2002). This is a question for a jury, not the defendants' expert.

(**7**) **Whether the officers were properly trained**. The defendants' have failed to discovery any training records establishing what training if any they received on how to respond to circumstances that led to the killing of Bishar Hassan. Defendants have not denied the existence of such records. Defendants cannot reasonably argue that plaintiffs have not met <u>Monell</u> requirements.

These are genuine issues of fact in dispute that must be determined by a jury.

**FACTS, IN RELEVANT PART.**

At least six people called to report that there was a man with a gun. Three (3) of the callers reported that the man was waving the gun. The callers also said that: (i) the man was pointing the gun down and the caller did not see anyone around man. [*Plaintiffs' exhibit #7 audio #19-11598-2-CT04*]; (ii) the man did not seem to be searching for anybody [*Plaintiffs' exhibit #8 audio #19-11598-3 CT05*], (iii) the man was just walking normally down the street in his hand fiddling with it, not pointing it at anyone; [*Plaintiffs' exhibit #9 audio # 19-11598-5-CT06*]; (iv) the man was not pointing it at anyone. [*Plaintiffs' exhibit #10 audio #19-11598-6-CT07*]. What was said over the radio by dispatch and the responding police officers in the field is unknown even though it is very likely that such a record exists.

Ahmed Hassan was at the roadside, at the location, where police shot his brother Bishar Hassan. He called 911 shortly after Bishar Hassan was shot and while

he was talking to the 911 operator, he was interrupted by a police officer who told him that by law, he was required to go with the police to the station. Ahmed Hassan informed the police that he wanted to go with his brother to the hospital, but he was informed by law enforcement, he was required to go to the police station. Ahmed Hassan was pat searched then transported to the police station where he was held in an interview room for several hours. It is undisputed that Ahmed Hassan was transported to APD, held in an interview room and interviewed. [*defendants' motion for summary judgment DKT 34 page 23 of 29*]. He was not allowed to leave, even after being interrogated, and he was also not allowed to speak to friends waiting outside even when he asked to talk to them. He was essentially kept in the dark about his brother's condition.

## ARGUMENT

## DETENSION AND ARREST (42 U.S.C. §1983)

## BISHAR HASSAN AND AHMED HASSAN WERE SEIZED IN VIOLATION OF THEIR CONSTITUTIONAL RIGHT UNDER THE 4TH AMMENDMENT

The Fourth Amendment to the United States Constitution protects an individual's right to be free from *unlawful* seizure. United States v. Al Nasser, 555 F.3d 722, 725 (9th Cir. 2009). The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266,273 (2002) [internal quotations omitted]. The Fourth

Amendment applies to states through the Fourteenth Amendment. Terry v. Ohio, 392 U.S.1, 8 (1968). To establish an unlawful seizure within the meaning of the Fourth Amendment, a person must first establish that a seizure occurred. Tennessee v. Garner, 471 U.S. 1, 7 (1985). A seizure occurs "when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority." United States v. Hernandez, 27 F.3d 1403, 1406 (9th Cir. 1994). "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Kaupp v. Texas, 538 U.S. 626, 629 (2003) [internal quotations omitted]; See also, Majaev v. State, 223 p.3d 629, 632 (Alaska 2010). When signaled to stop by law enforcement by use of a siren or red light, and the person stops, there has been a seizure which must be justified under the Fourth Amendment. United States v. Ward, 488 F.2d 162, 169 (9th Cir. 1973). A temporary detention for investigative purposes, or *Terry* stop, requires that the police officer have founded suspicion: reasonable suspicion based on articulable facts of some criminal activity afoot. United States v. Kerr, 817 F.2d 1384,1386 (9th Cir. 1987) (Internal quotes omitted).

Here the Municipality cannot reasonably argue that they did not seize Bishar Hassan. He was approached by three police cars with at least one having an activated

siren and overhead lights. Two of the cars mounted the sidewalk and drove directly at him. The activated siren and lights signaled a show of authority. Bishar Hassan submitted to the show of authority. Bishar Hassan was seized. The seizure was consistent with the Municipality's practice as articulated by Officer Hall in his post shooting interview. [*Plaintiffs' exhibit #1, pages 1&2*].

When interviewed by detectives, Officer Hall said (based on other calls involving someone waving a gun or some sort of gun involvement) "we contact suspect, detain him, secure the gun, uh, and then we investigate what possible crime we have. Which is how I felt this call was -was going to go. We were gonna go up, we were gonna talk to the guy, we were gonna detain him, we were gonna secure the weapon, um, and then we were gonna start talkin' to witnesses and possible victims of whatever crimes might be …." [*Plaintiffs' Exhibit #1, pages 1& 2*]. The Municipality's decision to seize Bishar Hassan was unreasonable.

Detentions without reasonable suspicion and arrests without probable cause are well established violations of the Fourth Amendment. <u>Terry</u>, 392 U.S. at 28-31 (investigatory stop requires reasonable suspicion); <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004)."Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" <u>United States v. Valdes-Vega</u>, 708 F.3d 1074,1078 (9th Cir. 2013) (internal quotes omitted). "An investigatory stop must be justified by some objective manifestation that the person

stopped is, or is about to be, engaged in criminal activity" <u>United States v. Cortez</u>, 449 U.S. 411, 417(1981). In conformity with *Terry*, a founded suspicion that criminal activity is afoot is a **minimum requirement** for any lawful detention stop. <u>United States v. Davis</u>, 459 F.2d 458 (9th Cir. 1972). <u>United States v. Ward</u>, 488 F.2D 162,169 (9th Cir. 1973). **The reasonableness of official suspicion must be measured by what the officers knew before they conducted their seizure**. <u>Florida v. J.L.</u>, 529 U.S. 266, 271-272 (2000). In <u>J.L.</u>, the Supreme court stated that an accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police to correctly identify the person whom the tipster means to accuse. **Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity**. **The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality,** not just in its tendency to identify a determinate person. <u>J.L.</u>, 529 U.S. 266, 271-272.

Here, the reliability requirement established by the Supreme Court in <u>J.L</u>, is not met. The Municipality had no evidence suggesting there was a crime afoot. Merriam-Webster Dictionary defines afoot to mean "in the process of development: underway. (See https://www.merriam-webster.com/dictionary/afoot; -last visited 11/08/22). The record does not establish that Bishar Hassan was in the process of committing a crime. (1) There was no allegation that Bishar Hassan displayed the firearm in a threatening manner. Even when specifically asked, none of the callers said that he pointed the gun

at a person or that he threatened anyone. (2) There was no evidence suggesting that the callers were alarmed by Bishar Hassan. None of the callers was frantic or anxious. Officer Hall stated that he did not see people fleeing from Walmart, the gas station or the bus stop where Bishar Hassan was alleged to be. There was no call from the bus Bishar Hassan was on. (3) There was no reliable evidence establishing that Bishar Hassan had committed a crime or was about to commit a crime.

In <u>United States v. Brown</u>, 925 F.3d 1150 (9th Cir. 2019), the court held that a report of a gun did not even constitute *reasonable suspicion* to stop Brown. Seattle police received a 911 call reporting that an unidentified person saw a young, black man with a gun. An officer spotted Brown, who matched the description, and "drove behind him for several blocks before turning on his patrol lights and driving the wrong direction down a one-way street to follow Brown." <u>Id</u>. at 1152. When the officer turned on his lights and began following Brown, he ran. We held that the officers lacked reasonable suspicion even to stop Brown. <u>Id</u>. at 1153-56.

In concluding the that the tip alone did not create reasonable suspicion that Brown -who was reported to have a gun on his person- was engaged in criminal activity, the courted stated that: (1) No evidence shows that the resident was alarmed at the time she reported seeing the gun. (2) There is no report that she yelled, screamed, ran, was upset, or otherwise acted as though she was distressed. (3) The 911 call reported only that the resident "walked in" and stated "that guy has a gun."

(4) The 911 dispatcher followed up trying to learn more about how Brown was displaying the gun, other than simply possessing it. But Katowitz simply reiterated, "[u]h, she just came in and said he has a gun." (5) Both of the officers that stopped Brown testified they were responding to a call about a "subject with a gun." (6) Considering the tipster's anonymity and the presumptive legality of carrying a concealed firearm in Washington, the "tip" alone did not create reasonable suspicion that Brown was engaged in any criminal activity. (7) Nothing in the record suggests that Brown was in the shelter, loitering in front of the shelter, or harassing or threatening anyone around the shelter. (8) Brown was walking away from the shelter at the time of the stop. While we do not take lightly the possibility of violence at a women's shelter, such **a threat was not part of the totality of circumstances confronting the officers who ultimately stopped Brown**. In the end, the 911 call revealed nothing more than an **unreliable anonymous tip** reporting presumptively lawful behavior. United States v. Brown, 925 F.3d 1150, 1154-1155 (9th Cir. 2019).

Like in Brown, here, a threat was not part of the totality of circumstances confronting the Municipality when they seized Bishar Hassan. Further, even before stopping Bishar Hassan, the Municipality lacked reliable reasonable suspicion. Under the holding in J.L., none of the callers provided information establishing concealed criminal activity. Thus, the Municipality did not have reliable evidence of crime being afoot.

10

In this circuit, a belief based on a mistaken understanding of the law cannot constitute the reasonable suspicion required for a constitutional traffic stop. "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2001). A suspicion based on such a mistaken view of the law cannot be the reasonable suspicion required for the Fourth Amendment, because "the legal justification [for a traffic stop] must be objectively grounded." Id. (quotations omitted). In other words, if an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment.

The Municipality stopped Bishar Hassan without reasonable suspicion. They violated his well-established constitutional right under the 4th Amendment of the federal constitution and Article 1, Section 14 of the Alaska constitution. This led to the killing of Bishar Hassan. Plaintiffs request summary judgment on this issue.

## THE MUNICIPALITY ILLEGALLY SEIZED AHMED HASSAN IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES.

"An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." Rosenbaum v. Washoe County, 663

F.3d 1071, 1076 (9th Cir. 2011). Importantly, "[t]he analysis involves both fact and law." Id.

Here, it is undisputed that Ahmed Hassan was transported to APD, held in an interview room and interviewed. (*defendants' motion for summary judgment DKT 34 page 23 of 29*). While being deposed by the defendants, Ahmed Hassan stated that at the scene of the shooting, even though he told the police officers that he wanted to go with his brother to the hospital, the officer told him that by law, he (Ahmed Hassan) was required to go with them to the police station. Ahmed Hassan testified that he went with the police because he did not want "to break the law". Ahmed Hassan said he did not know why he was being taken to the police station. [*Plaintiffs' exhibit #6 defendants' deposition of Ahmed Hassan*]. Ahmed Hassan was detained at the police station for hours and denied the opportunity to see his dying brother. Ahmed Hassan submitted it to the officer's authority. He was transported to the police station against his will and held in an interview room for hours. There is no evidence that Ahmed Hassan had committed a crime. The Municipality knew this fact and still continued to hold him at the police station. The Municipality cannot reasonably argue that Ahmed Hassan was not illegally seized. No one should suffer the mental and emotional distress of not being allowed to see his brother, talk to his family, friends and doctors. This was crudely reprehensible.

Plaintiffs should be granted summary judgment on this issue.

**THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

The Ninth Circuit has noted that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." Keates v. Koile, 883 F.3d 1228, 1234 (9th Cir. 2018) (quotations omitted). By considering qualified immunity at the pleadings stage, "the courts may be called upon to decide far-reaching constitutional questions on a nonexistent factual record." Kwai Fun Wong, 373 F.3d at 957. NAACP V. City of San Jose, 562 F. Supp.3D 382, 395. 2021 U.S.

To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. Pearson v. Callahan, 555 U.S. 223, 232 (2009). Castro v. City of Los Angeles, 833 F.3d 1060,1066-1067 (9th Cir. 2016). A right is clearly established when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Id., at 1067. The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand. *Anderson*, 483 U.S. at 638. **The law acknowledges that an otherwise competent officer will sometimes make an unreasonable decision or make an unreasonable mistake as**

to law or fact. **In those instances, the officer will appropriately be liable under §** **1983**. *See Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) Id., at 1078. The law must be clearly established such that it would "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by*; *see also Ramirez*, 560 F.3d at 1024. Id.

In Liberal v. Estrada, 632 F.3d 1064 (9th Cir. 2011), the court stated that: Plaintiff, Officer Estrada violated Plaintiff's clearly established constitutional right to be free from unreasonable seizures by initiating a traffic stop without having a reasonable suspicion that Plaintiff was engaged in illegal activity. Officer Estrada's determination that Plaintiff's windows were both rolled up and visibly tinted resulted from a mistake of fact. This mistake of fact, according to Officer Estrada, led him to conclude that the condition of Plaintiff's car violated California Vehicle Code. Officer Estrada therefore decided that he had reasonable suspicion to initiate a traffic stop." Id. Because we hold that Officer Estrada's mistake of fact was not reasonable, he is not entitled to qualified immunity. Liberal, at 1078. "We affirm the district court's denial of summary judgment to all individual defendants on the ground of qualified immunity for the length of Plaintiff's detention. Id.

Like in Liberal, here the Municipality seized Bishar Hassan without reasonable suspicion. They had no evidence of a crime being afoot. Not even when they observed

14

Bishar Hassan disembark from the bus. Instead, they acted like they do "most of the time", seize first then investigate if there is a crime. [*Officer Hall's statement plaintiffs exhibit #1*]. The Municipality cannot reasonably argue that they were unaware of Bishar Hassan's established constitutional right to be free from unreasonable searches and seizures.

Also, the Municipality seized Ahmed Hassan without probable cause. Like in Liberal, the Municipality illegally held Ahmed Hassan for hours. The Municipality cannot reasonably argue mistake. An objectively reasonable officer would have known that they had no grounds to seize Ahmed Hassan. Holding him for hours without probable cause was not only a violation of clearly established constitutional right to be free from unreasonable searches and seizures but it was also inhumane under the circumstances.

## A JURY COULD CONCLUDE THAT THE DEFENDANTS' USE OF FORCE WAS EXCESSIVE AND UNREASONABLE.  (42 U.S.C. §1983)

In Nehad v. Browder, 929 F.3d 1125 (9th Cir. 2019), the court stated that: "In Fourth Amendment excessive force cases, we examine whether police officers' actions are objectively reasonable given the totality of the circumstances. *Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). Our analysis must balance the nature of the intrusion

upon an individual's rights against the countervailing government interests at stake, without regard for the officers' underlying intent or motivations. *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, whether the suspect posed an immediate threat to anyone, whether the suspect resisted or attempted to evade arrest, and the severity of the crime at issue. *Id.* at 396. **Only information known to the officer at the time the conduct occurred is relevant**. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47, 198 L. Ed. 2d 52 (2017); *Glenn v. Washington Cty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011)." Nehad v. Browder, 929 F.3d 1125,1132 (9th Cir. 2019). "The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The use of deadly force is only reasonable if a suspect "poses a *significant* threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (emphasis added) (internal quotation omitted)." Id., at 1132-1133. **Browder's Credibility:** As an initial matter, "summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016). Here, approximately three hours after the shooting, Browder told homicide investigators that he did not see any weapons and made no mention of feeling

threatened by Nehad. Five days later, however, after consulting with his attorney and reviewing surveillance footage inside a police station, Browder claimed that he thought Nehad had a knife, that Nehad was "aggressing" the car, and that he thought Nehad was going to stab him. These possible inconsistencies, along with video, eyewitness, and expert evidence that belies Browder's claim that Nehad was "aggressing," are sufficient to give rise to genuine doubts about Browder's credibility. Id, at 1133. ***Whether, Even if Armed, Nehad Posed a Threat***: The fact that a person is armed does not end the reasonableness inquiry. *Glenn*, 673 F.3d at 872; *see also Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) ("[T]he mere fact that a suspect possesses a weapon does not justify deadly force.") (alteration in original). Indeed, we have often denied summary judgment in excessive force cases to police officers who use force against armed individuals. Here, an eyewitness testified that Nehad "wasn't aggressive in nature" and "didn't make any offensive motions." Browder himself testified that Nehad did not say anything, make any sudden movements, or move the supposed knife in any way. Browder further testified that he did not believe anyone else was under threat of immediate bodily harm when he shot Nehad. Under these facts, even if Browder had reasonably perceived Nehad as holding a knife, a reasonable factfinder could conclude that Nehad did not pose a danger to anyone. Id, at 1134. **Browder's Role in Creating the Danger:** Appellees make much of the (asserted) fact that Browder had less than five seconds between the

17

time he exited his vehicle and the moment he shot Nehad. We recognize, as we have often done before, that officers must act "without the benefit of 20/20 hindsight," and must often make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Sometimes, however, officers themselves may "unnecessarily creat[e] [their] own sense of urgency." *Torres*, 648 F.3d at 1127; *see also Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation."). **Reasonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, "with undue haste**." *Torres*, 648 F.3d at 1126. Here, evidence in the record could support such a determination. Id., at 1135.

**The Severity of the Crime at Issue**: Also relevant to the reasonableness inquiry is the severity of the crime at issue. *Graham*, 490 U.S. at 396. We have applied this factor in two slightly different ways. In *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), for example, we emphasized the government's interest in apprehending criminals, and particularly felons, as a factor "strongly" favoring the use of force. *Miller*, 340 F.3d at 964. Under our logic in *Miller*, a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor. Because

brandishing a knife in violation of California Penal Code § 417 is only a misdemeanor, a strict application of *Miller's* reasoning would provide little, if any, basis for a use of deadly force. Although the danger a suspect posed is a separate *Graham* consideration, courts, including this one, have used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied. *See, e.g., Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (holding, where officer reasonably concluded that a burglary might be in progress, severity-of-crime factor weighed in favor of use of force because burglary is "dangerous" and "can end in confrontation leading to violence"), *cert. denied sub nom. Lowry v. City of San Diego, Cal.*, 138 S. Ct. 1283, 200 L. Ed. 2d 469 (2018); *Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005) (en banc) (holding, where suspect had physically assaulted his wife but was standing alone on his porch when officers arrived, "the nature of the crime at issue provid[ed] little, if any, basis" for the use of force); *Conatser v. City of N. Las Vegas*, No. 206CV01236PMPLRL, 2009 U.S. Dist. LEXIS 141614, 2009 WL 10679150, at *6 (D. Nev. Nov. 9, 2009) (**finding severity of the crime "very low"** where no crime was in progress when police arrived, even though suspect might have threatened his mother before police arrived). Even if Nehad had made felonious threats or committed a serious crime prior to Browder's arrival, **he was indisputably not engaged in any such conduct when Browder arrived**, let alone when Browder fired

his weapon. **A jury could, therefore, conclude that the severity of Nehad's crimes, whether characterized as a misdemeanor or an already completed felony, did not render Browder's use of deadly force reasonable**. *See Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) ("[T]he fact that [the suspect] had committed a violent crime in the immediate past is an important factor but it is not, without more, a justification for killing him on sight.") Id., at 1136. **Whether Nehad Was Resisting Arrest or Seeking to Evade Arrest**: In analyzing whether a use of force was reasonable, we also look to whether the suspect was resisting arrest. *Graham*, 490 U.S. at 396. Here, video of the incident clearly shows that Nehad made no attempt to flee from Browder. Appellees argue, nevertheless, that Nehad resisted by failing to obey Browder's command to, "Stop, drop it." As discussed above, although two witnesses heard Browder give a command a few seconds before firing, neither Nelson nor Browder himself had any such recollection. Thus, whether Nehad resisted arrest by ignoring Browder's command is, at best, a disputed issue of fact. Id., at 1137.

**Failures to Warn:** In some cases, the absence of a warning or order to halt prior to deploying forceful measures against a suspect may suggest that the use of force was unreasonable. *Deorle v. Rutherford*, 272 F.3d at 1283-84. In *Deorle*, for example, we determined that "[s]hooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable" where "the officer neither orders the individual to stop nor

20

drop the can or bottle . . . ." *Id.* at 1284 (finding use of beanbag round unreasonable). We recognize, of course, that it may not always be feasible for an officer to warn a suspect prior to deploying force. Here, however, as discussed above, there is evidence that, like the suspect in *Deorle*, Nehad was walking toward Browder at a slow, steady pace, with no indication of violent intent. And here, as in *Deorle*, there is evidence that Browder never ordered Nehad to halt or to drop whatever he was carrying. Such facts could support a conclusion that Browder's decision to shoot Nehad was unreasonable. Id., at 1137. **Failure to Warn that Failure to Comply Would Result in the Use of Deadly Force:** Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis. *Deorle*, 272 F.3d at 1284. "Appropriate warnings comport with actual police practice. Our cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly."; *see also Glenn*, 673 F.3d at 864 (holding that an officer's use of a beanbag round without an appropriate prior warning weighed against reasonableness, even though officers had earlier warned the suspect that they would use lethal force and the shooting officer did yell "beanbag, beanbag" before firing). A prior warning is all the more important where, as here, the use of lethal force is contemplated. **Even assuming Browder did command Nehad to "Stop, drop it," there is no dispute that Browder never warned Nehad that a failure to comply would result in the use of force, let alone**

**deadly force. A jury could consider Browder's failure to provide such a warning as evidence of objective unreasonableness.** Id.

Here, a reasonable fact finder could conclude that: (**1**) Officer Hall is not credible. As previously argued his statements to detectives, days after the shooting, implied that he detained Bishar Hassan like they do "most of the time" -which is detain first and then investigate later if there is reasonable suspicion or probable cause to detain. [*Plaintiffs' Exhibit #1 pages 1&2*]. However, while being deposed by plaintiffs, Officer Hall testimony was to the effect that Bishar Hassan was stopped because he had violated the law. [*Plaintiffs' exhibit # 2 at page 33*]. Considering that he likely consulted with counsel and his supervisors after this suit was filed, like in Nehad, this inconsistent position is sufficient to give a jury a genuine doubt about Hall's credibility. (**2**) Bishar Hassan did not pose a danger to anyone. Like in Nehad, there is evidence that Bishar Hassan was not aggressive towards anyone, there was no evidence of a threat to anyone when Bishar Hassan was seized by police and there was no evidence of a crime afoot. (**3**) The officers' poor judgment and lack of prepared or training caused the Municipality to act unreasonably and thus created danger. (**4**) It was unreasonable to use deadly force because the severity of alleged crime was low (a class B misdemeanor under the Municipal code) and there was no crime in progress when he was seized by the police. (**5**) It was unreasonable to use deadly force because the evidence establishes that Bishar Hassan was not evading law

enforcement. (**6**) It was unreasonable not to warn Bishar Hassan that deadly force would be employed if he did not follow commands because the evidence (video) shows no indication of violent intent but the officers approaching Bishar Hassan in an aggressive manner. Three police cruisers, two with activated siren and lights driving on the sidewalk relatively fast and fairly directly at him. (**7**) It was unreasonable for Officer Hall continue shooting even after the gun fell out Bishar Hassan's hand because he was aware that he was "**getting hits**" and could tell in real time based on his observation of Bishar Hassan's bodily reaction and the fact that he knew he fired seven to eight shots. [*Plaintiffs exhibit # 3 page 6*].

Viewing the evidence in light most favorable to the plaintiffs, a rational trier of fact could find that the Municipality's use of deadly force was unreasonable and excessive.

## MONELL AND SUPERVISORY LIABILITY

"The Supreme Court in *Monell* held that municipalities may only be held liable under <u>section 1983</u> for constitutional violations resulting from official...policy or custom." <u>*Benavidez v. Cnty. of San Diego*</u>, 993 F.3d 1134, 1153 (9th Cir. 2021) **"[P]olicies can include written policies, unwritten customs and practices**, failure to train municipal employees on avoiding certain obvious constitutional violations, ... and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at

Case 3:21-cv-00076-SLG   Document 40   Filed 11/16/22   Page 23 of 30

least deliberate indifference of the municipality[.]" *Id.* at 1153 (internal citations omitted). "A municipality may [also] be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

In Nehad v. Browder, regarding the Monell issue, the court stated that: As an initial matter, Appellants need not show evidence of a policy or deficient training; **evidence of an informal practice or custom will suffice**. *See Los Angeles Cty. v. Humphries*, 562 U.S. 29, 30, 36, 131 S. Ct. 447, 178 L. Ed. 2d 460 (2010); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The Nehad shooting was approved by the department, which took no action against Browder; and (3) the department looks the other way when officers use lethal force. Indeed, Chief Zimmerman explicitly affirmed that Browder's shooting of Nehad "was the right thing to do," and the department identified Browder as the victim of the incident and conducted his interview several days after the shooting, once Browder had watched the surveillance video with his lawyer. This evidence is sufficient to create a triable issue at least as to the existence of an informal practice or policy and, thus, *Monell* and supervisory liability. Nehad, at 1141.

Here, Officer Hall's statement to the effect that "most to time" (based on other calls involving someone waving a gun or some sort of gun involvement) "we contact suspect, detain him, secure the gun, uh, and then we investigate what possible crime

24

we have.", establishes evidence of an informal practice or custom. [*Plaintiffs' Exhibit #1, page 1and 2*]. It is sufficient to create a triable issue at least as to the existence of an informal practice and thus <u>Monell</u> and supervisory liability.

As to the "failure to train' allegations, the defendants' have failed to produce a single piece of discovery speaking to training regarding response to a suspect armed with a gun or a person with a gun and suffering from mental illness. They simply argued that the request is burdensome. Defendants' response to the discovery request falls short of the discovery rules under 9th circuit law. [*Plaintiffs exhibit #11, Defendants' response to discovery request No.4,6,8,10,12,14,18,20&23 and Plaintiffs' exhibit #12, emails between plaintiffs and defendants*]. In opposing discovery on grounds of burdensomeness, the objecting party **is required to demonstrate** that the time and expense involved in responding to the requested discovery will, in fact, be unduly burdensome. A mere statement that complying with the discovery request will require "numerous man hours," is not sufficient. In considering the burden imposed on a party in responding to discovery, the Court should also consider whether the burden is a result of the party's lack of an adequate filing system or method for locating requested information. **Without factual information regarding how Defendant maintains, organizes, indexes and identifies its policy records, the Court cannot make such an**

**assessment**. Residential Contructors v. Ace Prop. 2006 U.S. Dist. LEXIS 80403 * | 2006 WL 3149362 at *26. [*Internal quotations omitted*].

Here, neither the plaintiffs nor the court can assess the validity of the Municipality's burdensomeness claim since they have not provided any details in support of their claim. Consequently, the court should hold the Municipality's motion for summary judgment in abeyance pending production of the discovery.

When coupled with the Officers failure to articulate what training if any they received as regards to responding to calls of a person with a gun, (Officer Hall's answer seem to consistently imply that it is situational. He essentially took the approach of being evasive or impliedly pleading the 5th Amendment of the federal constitution) [*Plaintiffs exhibit #2, pages 10 to 40*], it is reasonable to conclude that there was no such training.

**Because the Municipality has failed meaningfully respond to plaintiffs' discovery request in compliance with 9th circuit law, they should be precluded from introducing any search record.**

Regarding the Municipality's use of deadly force policy, it can reasonably be argued that the policy is one of shoot to kill. From officer Hall's account, even if he was aware that he was getting hits, he did not stop shooting even though there was no more danger. The Municipality seems to have cleared him of any wrongdoing and allowed him to return to work with a few days of the shooting. It is reasonable to

26

conclude that the Municipality and his supervisors ratified such conduct. Accordingly, the Municipality cannot argue that there is no basis for a claim under <u>Monell</u>.

**STATE LAW TORT CLAIMS**

Contrary to the defendants' position, plaintiffs assert that the defendants are not entitled to qualified immunity. Plaintiff relies on the afore argued points they made against the defendants' claim of qualified immunity. Further, as argued above, plaintiffs are still not discovery complete. By considering qualified immunity at the pleadings stage, the courts is being called upon to decide far-reaching constitutional questions on an incomplete factual record. See <u>NAACP V. City of San Jose</u>, 562 F. Supp.3D 382, 395. 2021 U.S. address a similar issue. It is for this reason among other that the Ninth Circuit has noted that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." <u>Keates v. Koile</u>, 883 F.3d 1228, 1234 (9th Cir. 2018) (citing Kwai Fun Wong v. United States, 373 F.3d 952, 956-57 (9th Cir. 2004)).

**FALSE ARREST.**

As previously argued, Ahmed Hassan was seized and taken to the police station against his will and without probable cause. Defendants deposed Ahmed Hassan and the aforementioned facts were established in that deposition. The defendants have not provided any evidence to contradict Ahmed Hassan's testimony or to justify his warrantless seizure. Plaintiffs rely on the argument they made establishing that

Ahmed Hassan was illegally seized in violation of his constitutional right under the 4th and 14th amendments of the federal constitution and under article 1, section 14 of the Alaska constitution.

## NIGLENT INFLICTION OF EMOTIONAL DISTRESS

It is undisputed that Ahmed Hassan was at the scene. (See defendants' motion for summary judgment page 24 footnote 159). Under Alaska law, "the bystander exception allows certain bystanders to recover damages for emotional distress caused by witnessing physical injury to another, proof of the following elements establishes a prima facie case of bystander liability: (1) the plaintiff was "near the scene of the accident"; (2) the plaintiff's shock resulted "from the sensory and contemporaneous observance of the accident"; and (3) a close relationship existed between the plaintiff and the injured individual. In *Tommy's Elbow Room* we relaxed the second element to require only that it be *reasonably foreseeable* that the plaintiff would suffer emotional harm as a result of the accident, rather than requiring that the plaintiff contemporaneously observed the accident." Schack v. Schack, 414 P.3d 639, 641-642 (Alaska 2018).

Ahmed Hassan did not need to actually witness the physical injury as the defendant asserted. The defendants' argument fails. And after knowing of the relationship they further damaged the plaintiff by apprehending, detaining, and denying him freedom of movement and choice.

28

**ALL STATE LAW CLAIMS (IIED, NIED, FALSE ARREST, BATTERY)**

Contrary to the defendant's assertions, none of the state law claims are ripe for summary judgment. In Green v. City and County of San Francisco, 751 F. 3d 1039 (9th Cir. 2014), the court ruled that: state law claims under the Bane Act and for IIED, assault, and negligence could not be dismissed because Green raised triable issues of fact concerning the lawfulness of her detention. As it remains a question whether the conduct at issue was lawful, the district court's grant of summary judgment on the state law claims is reversed and remanded. Green, at 1053.

Like in Green, here the plaintiffs still have a Monell claim that is unresolved. Plaintiffs have raised triable issues of fact concerning the lawfulness of the seizure and detention of Bishar Hassan and Ahmed Hassan. Like in Green, these claims cannot be dismissed without first resolving the lawfulness of the stop and seizure by the Municipality. Therefore, motion for summary judgment on all state issues should be denied.

**DAMAGES**

The Ninth Circuit has recognized a parent's liberty interest in the companionship and society of his or her child, and that state interference with that interest without due process creates a cause of action under 42 U.S.C. § 1983. Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001). *see also* Curnow v. Ridgecrest Police, 952 F.2d 321 (9th Cir. 2001) (allowing parents of an adult child

who had been shot and killed by police to proceed with their §1983 action alleging deprivation of companionship and society with their child). Further, whether Bishar Hassan could have or would have earned more is a question of fact for a jury. The defendants have not provided any conclusive evidence establishing that Bishar Hassan would not have earned money.

**CONCLUSION**

Defendants' motion for summary judgment should be denied. Plaintiffs cross motion for summary judgment should be granted as to:

(1) Illegal seizure of Bishar Hassan

(2) Illegal seizure and detention of Ahmed Hassan

(3) Defendants not being entitled to qualified immunity

(4) Defendants' being precluded from introducing any training records that they are yet to discover to plaintiffs as of 11/10/22.

(5) False arrest

RESPECTFULLY SUBMITTED this 10th day of November 2022.

/s/ Rex L. Butler
REX LAMONT BUTLER
Attorney for Plaintiffs

Certificate of service
I hereby certify that this document was served upon defendants' attorney Pamela Weiss, through ECF Filing on 11/16/22 and is the same to the filing at dkt 37 but for the notice of incorporation.

/s/Rex L. Butler
Rex Lamont Butler

30